## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARY LEY

       Plaintiff,

vs.                                               Case No.
                                                   Case Code:

WISCONSIN BELL, INC.,
SBC,
AT&T

       Defendants.            The amount in controversy exceeds $75,000.

                                        Trial by jury demanded.

## COMPLAINT

Plaintiff Mary Ley complains of defendants Wisconsin Bell, Inc., SBC, and AT&T ("Defendants") as follows:

### Nature of action

1. This is an action to redress the legal and equitable wrongs suffered by Plaintiff Mary Ley when Defendants discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12101 et. seq.], and when Defendants willfully violated the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq. [hereinafter FMLA].

### Parties

2. The plaintiff is Mary Ley ("Plaintiff").

3. Defendant Wisconsin Bell, Inc. ("Defendant Wisconsin Bell") is a Wisconsin corporation which employs in excess of 500 employees, and

1

which employed Plaintiff via direct control of the employment relationship and/or via control through an entity that is a subsidiary, parent or other affiliated entity of this defendant.

4. Defendant AT&T ("Defendant AT&T") is a corporation that does substantial business in Wisconsin and employs in excess of 500 employees, and employed Plaintiff via direct control of the employment relationship and/or via control through an entity that is a subsidiary, parent or other affiliated entity of this defendant.

5. Defendant SBC ("Defendant SBC") is a corporation that does substantial business in Wisconsin and employs in excess of 500 employees, and employed Plaintiff via direct control of the employment relationship and/or via control through an entity that is a subsidiary, parent or other affiliated entity of this defendant.

6. Defendant AT&T and Defendant SBC both are (or were) parent companies to Wisconsin Bell, Inc., issued policies for Wisconsin Bell, Inc., gave directives to Wisconsin Bell, Inc., and/or may have employees involved with the decisions to terminate Ms. Ley's employment and to assert pretextual reasons for doing so.

**Fulfillment of conditions precedent**

7. Plaintiff has fulfilled all conditions precedent to the filing of her ADA claims.

8. Plaintiff filed disability-discrimination complaints with the Wisconsin Equal Rights Division (ERD) for the three Defendants named herein, and ERD cross-filed those complaints with the Equal Employment

2

Opportunity Commission (EEOC).

9. The EEOC issued Plaintiff Notices of Right to Sue for her discrimination complaints for the three Defendants.

## **Jurisdiction and venue**

10. This Court has jurisdiction under §706(f)(3) of Title VII of the Civil Rights Act of 1964, as amended, [42 U.S.C. §2000e-5(f)(3)] as incorporated by §107(a) of the Americans with Disabilities Act of 1990 [42 U.S.C. 12117(a)].

11. Jurisdiction over Plaintiff's FMLA claims is conferred upon this court pursuant to 29 U.S.C. §2617(a)(2).

12. Plaintiff worked for the Defendants in Appleton, Wisconsin (Outagamie County), within the Eastern District of Wisconsin, Green Bay division. Venue is proper by §706(f)(3) of Title VII [42 U.S.C. §2000e-5(f)(3)] and by §1391(b) of the Judicial Code [28 U.S.C. §1391(b)]. Venue is also proper by §706(f)(3) of Title VII of the Civil Rights Act of 1964, as amended, [42 U.S.C. §2000e-5(f)(3)] as incorporated by §107(a) of the Americans with Disabilities Act of 1990 [42 U.S.C. 12117(a)] and by §1391(b) of the Judicial Code [28 U.S.C. §1391(b)]. Venue in the United States District Court for the Eastern District of Wisconsin, Green Bay division is appropriate under 28 U.S.C. § 1391 (a) and (b), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Wisconsin, Green Bay division.

## **Plaintiff's Employment with Defendants, Overview**

13. Plaintiff started work for Defendants on May 7, 2001 and her employment ended on August 31, 2007.

3

14. At the time Plaintiff's employment ended, her job title was Customer Service Sales representative.

15. At the time Plaintiff's employment ended, her immediate supervisor was Cheryl Devroy, whose job title was Manager, Customer Care. Manager Devroy's supervisor was Al Rockman, whose job title was Director.

16. Manager DeVroy and Director Rockman were subject to the supervision and directives of Defendants' General Manager (GM) Julene Baldwin.

17. GM Baldwin, Director Rockman, and Manager DeVroy all had a significant part in terminating Plaintiff's employment.

18. Defendants gave Plaintiff positive performance reviews, and she earned several awards, throughout her employment with Defendants. This included a positive performance review in July of 2007, just 4-6 weeks before she was terminated for alleged performance deficiencies.

**Plaintiff's Multiple Sclerosis, Depression and Other Conditions; Physical Limitations**

19. In February 2007, Plaintiff started having serious medical problems. At first, she had earaches, and ringing in her ears. By the end of February, she felt a blockage in her right ear. By the beginning of March, she had lost her hearing in her right ear.

20. Plaintiff was very ill in the month of March 2007. During that month, she was only able to work about 1 hour per week, and she was using FMLA leave time (which Defendants had approved). Plaintiff had vertigo, and couldn't stand up. At times, her right side was paralyzed, and at other times she could not talk. On March 26, 2007 Plaintiff had an MRI.

21. On March 29, 2007, Plaintiff was diagnosed with multiple sclerosis (MS).

22. Plaintiff's MS has effects on her physical functioning and life activities that include, but are not limited to the following:

    a. She often has to use a cane to walk or stand.

    b. She cannot stand for long periods of time; her legs give out and she falls down.

    c. She cannot take long walks due to fatigue and early exhaustion.

    d. She cannot ride a bicycle because of problems with balance.

    e. The sensation and feeling in her hands and forearms are very limited, and because of this she has received several burns on her hands and forearms.

    f. She has significant problems applying makeup, and had tattoos of eyeliner put on her eyes because she cannot effectively apply eye liner manually.

    g. She has daily fatigue, which becomes more pronounced toward the end of the day, after about 6:00 pm. After that time, she has to spend extra effort and time on physical tasks.

    h. She is also unable to speak clearly toward day end, from about 6:00pm and later. Her speech becomes impaired, and she is unable to pronounce words in their entirety. Consonants do not come out like they are supposed to. Others have told her that she slurs sentences and that her speech sounds lazy.

    i. Sometimes she needs to spend all weekend in bed (the whole two days off of physical tasks), to physically recover from fatigue.

j. Due to fatigue, she can only perform one chore a day like the dishes or laundry.

k. Her sleep is disrupted because she cannot sleep a whole night without getting a spasm or charley horse in her extremities.

l. She has auditory problems, and has particular trouble hearing whispers and quiet conversation. On several occasions, she has also had problems hearing people speak in front of her. She watches for body language and at times reads lips so she can make sense of certain conversations.

m. While working (for Defendants and elsewhere), due to typing and other repeated use of extremities (fingers, legs and arms), Plaintiff has suffered from fatigue and her extremities have had spasms throughout the day.

n. She had increased problems with typing and dyslexia.

o. When working late-day hours (for Defendants and elsewhere), her speech became impaired. As described above, her late-day speech sounded increasingly slurred and lazy, as she became unable to pronounce words.

p. At times at work (for Defendants and elsewhere), she would have trouble hearing what persons on the phone said and would ask them to repeat themselves.

q. Due to her MS, and her use of a swivel chair at her desk while working (for Defendants and elsewhere), she frequently had vertigo and would easily become nauseated.

6

23. Plaintiff's MS is a permanent condition.

24. All of Plaintiff's symptoms above have occurred, either continually or during recurring periods of time, since her diagnosis. The symptoms will continue to occur permanently.

25. During Plaintiff's employment with Defendants, she also suffered from migraines and depression. Her depression was first diagnosed in 2001, and she had taken prescription medication (Celexa) for depression the whole time she was employed by Defendants. Her MS exacerbates her depression.

26. Plaintiff is substantially limited in her ability to hear.

27. Plaintiff is substantially limited in her ability to walk.

28. Plaintiff is substantially limited in her ability to stand.

29. Plaintiff is substantially limited in her ability to speak.

30. Plaintiff is substantially limited in her ability to perform manual tasks.

31. Plaintiff is substantially limited in her ability to care for herself.

32. Plaintiff is substantially limited in her ability to sleep.

33. Plaintiff is substantially limited in her ability to learn.

34. Plaintiff is substantially limited in her ability to concentrate.

35. Plaintiff is substantially limited in her ability to think.

36. Plaintiff is substantially limited in her ability to work.

37. Plaintiff has physiological conditions, MS and migraines, that affect her musculoskeletal body system, and has "physical impairments" as defined by 29 C.F.R. §1630.2 (h).

38. Plaintiff has "mental or psychological disorders," depression and dyslexia,

has "... emotional or mental illness, and specific learning disabilities," and has "mental impairments" as defined by 29 C.F.R. §1630.2 (h).

39. Plaintiff has physical and mental impairments that substantially limit one or more of her major life activities.

40. Plaintiff could, with or without reasonable accommodations, perform the essential functions of the employment position she had held with Defendants.

41. Defendants were aware Plaintiff had MS.

42. Defendants regarded Plaintiff to have MS.

43. Defendants were aware Plaintiff had a record of having MS.

44. Defendants knew Plaintiff had a physical impairment.

45. Defendants regarded Plaintiff to have a physical impairment.

46. Defendants were aware Plaintiff had a record of having a physical impairment.

47. Defendants knew Plaintiff had a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

48. Defendants regarded Plaintiff to have a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

49. Defendants were aware Plaintiff had a record of having a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

50. The persons responsible for Plaintiff's employment termination knew she

8

had a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

51. The persons responsible for Plaintiff's employment termination regarded her to have a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

52. The persons responsible for Plaintiff's employment termination were aware Plaintiff had a record of having a physical impairment that substantially limited her ability to hear, walk, stand, speak, perform manual tasks, care for herself, sleep, and/or work.

53. Defendants knew Plaintiff had a physical impairment that substantially limited one or more of her major life activities.

54. Defendants regarded Plaintiff to have a physical impairment that substantially limited one or more of her major life activities.

55. Defendants were aware Plaintiff had a record of having a physical impairment that substantially limited one or more of her major life activities.

56. The persons responsible for Plaintiff's employment termination knew she had a physical impairment that substantially limited one or more of her major life activities.

57. The persons responsible for Plaintiff's employment termination regarded her to have a physical impairment that substantially limited one or more of her major life activities.

58. The persons responsible for Plaintiff's employment termination were aware Plaintiff had a record of having a physical impairment that substantially limited one or more of her major life activities.

59. Defendants knew Plaintiff had depression.

60. Defendants regarded Plaintiff to have depression.

61. Defendants were aware Plaintiff had a record of having depression.

62. Defendants knew Plaintiff had a mental impairment.

63. Defendants regarded Plaintiff to have a mental impairment.

64. Defendants were aware Plaintiff had a record of having a mental impairment.

65.  Defendants knew Plaintiff had a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

66. Defendants regarded Plaintiff to have a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

67. Defendants were aware Plaintiff had a record of having a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

68. The persons responsible for Plaintiff's employment termination knew she had a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

69. The persons responsible for Plaintiff's employment termination regarded her to have a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

70. The persons responsible for Plaintiff's employment termination were

aware Plaintiff had a record of having a mental impairment that substantially limited her ability to learn, concentrate, think, and/or work.

71. Defendants knew Plaintiff had a mental impairment that substantially limited one or more of her major life activities.

72. Defendants regarded Plaintiff to have a mental impairment that substantially limited one or more of her major life activities.

73. Defendants were aware Plaintiff had a record of having a mental impairment that substantially limited one or more of her major life activities.

74. The persons responsible for Plaintiff's employment termination knew Plaintiff had a mental impairment that substantially limited one or more of her major life activities.

75. The persons responsible for Plaintiff's employment termination regarded Plaintiff to have a mental impairment that substantially limited one or more of her major life activities.

76. The persons responsible for Plaintiff's employment termination were aware Plaintiff had a record of having a mental impairment that substantially limited one or more of her major life activities.

77. Defendants knew Plaintiff had an ADA disability.

78. Defendants regarded Plaintiff to have an ADA disability.

79. Defendants were aware Plaintiff had a record of having an ADA disability.

80. The persons responsible for Plaintiff's employment termination knew Plaintiff had an ADA disability.

81. The persons responsible for Plaintiff's employment termination regarded

Plaintiff to have an ADA disability.

82. The persons responsible for Plaintiff's employment termination were aware Plaintiff had a record of having an ADA disability.

**Medical Leaves and Accommodation Requests**

83. After Plaintiff's diagnosis of MS, she requested several accommodations, including but not limited to requests her overtime hours be reduced, and requests for medical leaves.

84. These requested accommodations were reasonable.

85. Defendants generally complied with Plaintiff's accommodation requests, but their management (particularly GM Baldwin, Director Rockman, and Manager Devroy) had animus toward Plaintiff because of her accommodation requests, and in particular had animus about Plaintiff having requested and taken medical leaves.

86. On or about April 3, 2007, Plaintiff started a 6-week short term disability (STD) leave.

87. The STD leave was a reasonable accommodation for Plaintiff's disability of MS.

88. The medical leave, which qualified for STD coverage, also qualified for FMLA coverage under federal FMLA law, and was simultaneously FMLA leave.

89. Plaintiff ended her medical leave, and returned to work on a part time basis (5 hours per day), on May 15, 2007.

90. On July 1, 2007, Plaintiff returned to fulltime work (40 hours per week).

91. Plaintiff's doctor prohibited her from working overtime as a medical

restriction.

92. The overtime prohibition was a reasonable accommodation for Plaintiff's MS.

93. Between July 1, 2007 and Plaintiff's August 14, 2007 suspension, she missed some work on another occasion, when she took approved medical leave (for reasons due to her MS) for 3.25 hrs on July 23, 2007.

94. This medical leave qualified for, and was approved by Defendants for, FMLA leave.

95. In July 2007, Manager Devroy made a comment to Plaintiff (or similar comment) that: "since you have missed so much time this year (on medical leave), you had better sell your butt off."

**Audit and Criticism of Phone Calls a Short Time After Plaintiff's Return to Fulltime Work; Termination of Employment; Pretext**

96. On August 14, 2007, a short time from Plaintiff's July 1 date of return to fulltime work, Plaintiff found a note on her computer, asking her to see Manager Devroy.

97. Plaintiff met with Manager Devroy in an empty office. Manager Devroy then had Plaintiff listen to two recorded phone calls that she had with two customers.

98. Then Manager Devroy brought Plaintiff to a room where Director Rockman and two union representatives (Betsy LaFontaine and Bob Young) were sitting.

99. Director Rockman and Manager Devroy started discussing the two phone calls, and criticized Plaintiff for how she handled the two calls.

100.    Defendants told Plaintiff she was terminated, on that date of August 14, 2007, primarily because of the two phone calls. Defendants also claimed that a "code of conduct" violation Plaintiff had almost a year before (in September 2006) also factored into their termination decision.

101.    GM Baldwin, Director Rockman, and Manager DeVroy were the primary decision-makers in terminating Plaintiff's employment.

102.    On August 30, 2007, Plaintiff had a union grievance proceeding to contest her termination. Defendants' Labor Lead Relations Manager Peggy Texxeira said Defendants should give Plaintiff a second chance at employment. Defendants refused to change their decision.

103.    Plaintiff's employment was formally terminated on August 31, 2007.

104.    Defendants later brought recordings of the two phone calls to Plaintiff's unemployment hearing at the Department of Workforce Development (DWD).

105.    The appeal tribunal at the DWD unemployment hearing heard both of the phone calls in their entirety.

106.    The tribunal found, with regard to one of the two calls that Defendants asserted Plaintiff was terminated for, that "The [Plaintiff's] handling of the entire call was exemplary."

107.    With respect to the other call, the unemployment appeal tribunal stated the following:

> "When the customer resumed her occasionally profane and abrasive complaints, the [Plaintiff] asked if she had answered all of the

customer's questions. The customer answered in the affirmative. The [Plaintiff] then thanked her for doing business with the employer and told her to have a great weekend. The customer seemed to resume her service complaints but in a manner as though talking to herself. The [Plaintiff] did not hear the customer continue to talk, perhaps to herself, and then hung up the phone. This customer did not complain about the [Plaintiff] to the employer."

108. Defendants' reasons for Plaintiff's termination are pretext.

109. Several other customer service representatives in Plaintiff's work area, who were not disabled and who had not used FMLA time, had used language with customers, and had misconduct involving customers, far worse than what Defendants alleged Plaintiff had committed and alleged she was terminated for. These other employees were not terminated despite their conduct being far more severe than the alleged conduct by Plaintiff.

**Appleton Call Center's Poor Conduct Toward Employees With Disabilities and FMLA Leave, and Many Legal Complaints and EEOC Investigation About the Same**

110. Defendants' Appleton Call Center (where Plaintiff was employed) was at all material times overseen by GM Baldwin.

111. Defendants' Appleton Call Center employs approximately 300 Customer Service Sales representatives.

112. Between January 1, 2005 and December 31, 2007, at least 15 workers who had worked in customer service at Defendants' Appleton Call

Center had filed disability discrimination complaints with ERD or EEOC, and/or had filed Wisconsin FMLA complaints with ERD.

113.     With regard to several disability discrimination complaints (not including Plaintiff's) from Appleton Call Center workers that were filed at ERD, EEOC took the unusual measure of stepping in and assuming investigation of those complaints.  That EEOC investigation is pending.

### GM Baldwin's Animus and Directives that Management at Appleton Call Center Harass, Discriminate, and Target for Termination, Employees With Disabilities and FMLA Leave

114.     GM Baldwin directed Director Rockman, Manager Devroy, and other managers at Defendants' Appleton Call Center to harass employees who took medical leaves including employees who took STD and FMLA leaves.

115.     GM Baldwin directed Director Rockman, Manager Devroy, and other managers at Defendants' Appleton Call Center to target for increased performance scrutiny employees who took medical leaves including employees who took STD and FMLA leaves.

116.     GM Baldwin directed Director Rockman, Manager Devroy, and other managers at Defendants' Appleton Call Center to target for termination (or pressured resignation) employees who took medical leaves including employees who took STD and FMLA leaves.

117.     GM Baldwin had discriminatory animus toward workers who had disabilities.

118.     GM Baldwin had discriminatory animus toward workers who had STD leaves.

119.    GM Baldwin had discriminatory animus toward workers who exercised FMLA rights and took FMLA leaves.

120.    GM Baldwin made statements reflecting discriminatory animus toward workers who had disabilities, who had STD leaves, and who had exercised FMLA rights and took FMLA leaves.

121.    GM Baldwin had discriminatory animus toward Plaintiff because she had disabilities, had STD leave, and had exercised FMLA rights and took FMLA leaves.

122.    Director Rockman had discriminatory animus toward workers who had disabilities.

123.    Director Rockman had discriminatory animus toward workers who had STD leaves.

124.    Director Rockman had discriminatory animus toward workers who exercised FMLA rights and took FMLA leaves.

125.    Director Rockman made statements reflecting discriminatory animus toward workers who had disabilities, who had STD leaves, and who had exercised FMLA rights and took FMLA leaves.

126.    Director Rockman had discriminatory animus toward Plaintiff because she had disabilities, had STD leave, and had exercised FMLA rights and took FMLA leaves.

127.    Manager Devroy had discriminatory animus toward workers who had disabilities.

128.    Manager Devroy had discriminatory animus toward workers who had STD leaves.

Case 1:09-cv-01108-WCG   Filed 11/30/09   Page 17 of 22   Document 1

129.     Manager Devroy had discriminatory animus toward workers who exercised FMLA rights and took FMLA leaves.

130.     Manager Devroy made statements reflecting discriminatory animus toward workers who had disabilities, who had STD leaves, and who had exercised FMLA rights and took FMLA leaves.

131.     Manager Devroy had discriminatory animus toward Plaintiff because she had disabilities, had STD leave, and had exercised FMLA rights and took FMLA leaves.

132.     Defendants terminated Plaintiff's employment because she had disabilities, had STD leave, and had exercised FMLA rights and took FMLA leaves.

133.     Defendants, including GM Baldwin, Director Rockman, and Manager Devroy, terminated Plaintiff's employment in knowing and willful violation of FMLA law and ADA law.

134.     Independent of FMLA willfulness and statute of limitations standards, Defendants' FMLA statute of limitations should be equitably tolled such that the limitations period begin running from the point that Plaintiff learned from witness Sean Brownson in July 2009 that Manager Devroy had communicated specific animus about workers who took FMLA leave.

**Damages**

135.     After being terminated by Defendants, Plaintiff diligently sought and obtained work with other employers.

136.     As a proximate result of Defendants' acts and/or omissions as pled

in this Complaint, Plaintiff lost wages, back pay, employment benefits, and suffered emotional distress, pain and other damages.

## Count I – ADA Violation

137.     Plaintiff realleges paragraphs 1 through 136 of this Complaint.

138.     Plaintiff was, at all times relevant to this Complaint, an "employee" of Defendant's within the definition of §101(4) of the Americans with Disabilities Act of 1990 [42 U.S.C. §12111(4)]

139.     Plaintiff was, at all times relevant to this Complaint, a "qualified individual with a disability" within the definition of §101(8) of the Americans with Disabilities Act of 1990 [42 U.S.C. §12111(8)], and an individual with a disability under 42 U.S.C. § 12102, including an individual with a (A) "physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (B) "a record of such an impairment;" and/or (C) "being regarded as having such an impairment."

140.     Defendants were, at all times relevant to this Complaint, an "employer" within the definition of §101(5) of the Americans with Disabilities Act of 1990 [42 U.S.C.§12111].

141.     By their actions and/or omissions as alleged in this Complaint, Defendants discriminated against Plaintiff on the basis of her disability in violation of the Americans with Disabilities Act.

142.     Defendants discriminated against Plaintiff in violation of the Americans with Disabilities Act with malice or reckless indifference to the

federally protected rights of Plaintiff.

143.     To deter future malice or reckless indifference to the federally protected rights of employees by Defendants and other employers and to punish Defendants for their malice or reckless indifference to the federally protected rights of Plaintiff, exemplary damages should be awarded.

**Wherefore**, plaintiff Mary Ley prays that this Court:

    a.  Order Defendants to post notices concerning their duty to refrain from discriminating against their employees on the basis of any disability;

    b.  Enjoin Defendants from discriminating against their employees on the basis of any disability;

    c.  Order the Defendants to reinstate Plaintiff to her position (or a comparable position) or, in the alternative, to pay Plaintiff for such a position for a reasonable time into the future;

    d.  Award Plaintiff the back pay, employment benefits, and other compensation she lost as a result of Defendants discriminating against her on the basis of disability;

    e.  Award prejudgment interest at the prevailing rate on the award of back pay, lost employment benefits, and other compensation lost to Plaintiff as a result of Defendants discriminating against her on the basis of disability;

    f.  Enter judgment in Plaintiff's favor and against Defendants for compensatory damages for the harm she suffered as a result of Defendants discriminating against her on the basis of disability;

g. Enter judgment in Plaintiff's favor and against Defendant for exemplary damages;

h. Award Plaintiff her reasonable attorney's fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

i. Award Plaintiff such other relief as this Court deems just and appropriate.

**Count II – FMLA Violations**

144. Actions of Defendant, as described in paragraphs 1-143, constitute violations of the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq.* (FMLA), in that the Defendants deliberately and intentionally violated the FMLA by discharging and otherwise retaliating against Plaintiff because she sought FMLA leave and otherwise exercised and sought to exercise rights under the FMLA.

145. To the extent Defendants may allege Plaintiff did not have a serious health condition, Defendants are equitably estopped from such an eligibility defense because Defendants did not express to Plaintiff any alleged deficiency in the medical certification she provided, or have or express reason to doubt the validity of the medical certification provided.

**Wherefore**, plaintiff Mary Ley prays that this Court enter judgment:

(a) That the discharge of Plaintiff was in violation of the FMLA.

(b) For Plaintiff's reinstatement to the same position, or to a comparable position, as that Plaintiff was performing before Defendants discharged her, for back pay, liquidated damages, pre-judgment and post-

Case 1:09-cv-01108-WCG    Filed 11/30/09    Page 21 of 22    Document 1

judgment interest, together with costs, expert witness fees and reasonable attorneys' fees, and any other damages under the FMLA.

(c) For such other relief that this court may deem just, equitable and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated this 30th day of November 2009.

Peterson, Berk & Cross, S.C.
Attorneys for Plaintiff


s/Michael F. Brown
Michael F. Brown
State Bar No.: 1041753

P.O. Address

Michael F. Brown
Peterson, Berk & Cross, S.C.
200 E. College Ave.
Appleton, WI 54912

(920)831-0300
(920)831-0165 (Facsimile)

mbrown@pbclaw.com